PILLSBURY WINTHROP SHAW PITTMAN LLP
DAVID J. TSAI (SBN 244479)
  david.tsai@pillsburylaw.com
ALEKZANDIR MORTON (SBN 319241)
  alekzandir.morton@pillsburylaw.com
SURUI QU (SBN 332105)
  surui.qu@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA  94111-5998
Telephone:        415.983.1000
Facsimile:         415.983.1200

Attorneys for Plaintiff
Wiwynn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WIWYNN CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>X Corp.,<br><br>　　　　　Defendant. | Case No. 3:24-cv-05322-AGT<br><br>**PLAINTIFF WIWYNN CORPORATION'S FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**[REDACTED - PUBLIC]** |

Plaintiff Wiwynn Corporation ("Plaintiff" or "Wiwynn") brings this First Amended Complaint ("FAC") against Defendant X Corp. ("Defendant" or "X Corp.") and alleges as follows:

**NATURE OF ACTION**

1. Wiwynn Corporation is an innovative provider of customized cloud IT infrastructure solutions, specializing in high-performance computing and storage products.  Wiwynn works closely with its customers to deliver tailored solutions that address their specific technical and operational needs.

2. X Corp., formerly Twitter, Inc. ("Twitter"), is a global social media platform that provides digital services for its large user base.

3. Recognizing the value of Wiwynn's custom-tailored solutions, on September 24, 2014, X Corp. entered into a Master Purchase Agreement with Wiwynn. For nearly eight years, X Corp. sourced and Wiwynn provided unique, custom-designed IT infrastructure products including rack solutions for X Corp.'s data centers, based on forecasts provided by X Corp. The components used to build the products are largely unique to the products, resulting in long lead times for ordering such component parts from suppliers. To ensure that products could be manufactured on the strict timeline X Corp. required, X Corp. specifically gave written approval for Wiwynn to purchase the necessary components to manufacture the custom products being made for X Corp., and expressly assumed liability for the procurement costs.

4. The parties' cooperation went smoothly until late 2022, when X Corp. (under its new leadership) began to default on its payment obligations for products ordered under the Master Purchase Agreement and failed to respond to Wiwynn's inquiries regarding overdue payments.

5. As a result of X's clear repudiation of the Master Purchase Agreement, Wiwynn was forced to cease production. At that time, Wiwynn had delivered over $32 million worth of finished products for which X was delinquent in payment and additionally had procured and paid for, at the direction and approval of X, a large quantity of components for which X committed to assume liability. As explained herein, X is still liable to Wiwynn for at least $61 million.

## PARTIES

6. Plaintiff Wiwynn Corporation is a corporation organized and existing under the laws of Taiwan, with its principal place of business located at 8F, 90, Sec.1, Xintai 5th Road, Xizhi District, New Taipei City 22102, Taiwan.

7. Upon information and belief, Defendant X Corp. is a corporation organized and existing under the laws of Nevada, with a mailing address and place of business located at 1355 Market Street, Suite 900, San Francisco, California 94103.

## JURISDICTION AND VENUE

8. This Court has diversity jurisdiction under 28 U.S.C. sections 1332(a)(1), 1332(a)((2) and 2201 because there is complete diversity between Wiwynn and X Corp. and because the amount in controversy exceeds $75,000.

9. This Court has personal jurisdiction over X Corp. pursuant to a binding jurisdiction clause within an agreement giving rise to the present dispute that was negotiated and executed by the parties, which states that "[a]ny legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California and the parties hereby irrevocably consent to the personal jurisdiction and venue therein." Further, this Court has personal jurisdiction over X Corp. because X Corp. has a place of business in this District, and, at all relevant times, has conducted commercial activities within the State of California that are substantial, continuous, and systematic.

10. Venue is proper under 28 U.S.C. § 1391(b) and based on X Corp.'s express prior consent in the agreement to the venue of this Court. Further, venue is proper in this District because X Corp. resides in this District and is subject to personal jurisdiction here, and because a substantial part of the events, acts and omissions giving rise to the claims occurred in this District.

**FACTUAL ALLEGATIONS**

11. Wiwynn is an innovative provider of cloud IT infrastructure solutions, specializing in high-performance computing and storage products, including integrated rack solutions for leading data centers. Wiwynn offers a full suite of services, including the design, assembly, customization, testing, and validation of its products, ranging from individual components to fully integrated systems, including what are known as L10 and L11 rack integration services. Wiwynn has a business model to work directly with customers to design and deliver custom solutions tailored to their individual needs.

12. On September 24, 2014, recognizing the value that Wiwynn's cloud IT infrastructure products would bring, X Corp. (then known as Twitter, Inc.) contracted with Wiwynn and entered into a Master Purchase Agreement. A true and correct copy of the Master Purchase Agreement is attached hereto as **Exhibit A**.

13. Pursuant to the Master Purchase Agreement, X Corp. agreed to purchase and Wiwynn agreed to manufacture IT infrastructure products customized according to the specific features, technical requirements, and performance standards provided by X Corp. in the form of exhibits attached to the Master Purchase Agreement (referred to as "Product Exhibits" under the Master

1  Purchase Agreement). True and correct copies of the Product Exhibits and award letter of the products
2  relevant to this action are attached here to as **Exhibit B**.

3      14.    The manufacture of these custom-made products required a complex and globally
4  managed supply chain. The production involved the procurement of numerous components, many of
5  which were custom components specifically tailored to X Corp.'s unique product needs. These custom
6  components were sourced from various suppliers worldwide and required significant lead times for
7  procurement. The parties acknowledged the critical nature of custom components in each Product
8  Exhibit by including an appendix listing such components as "Unique Long Lead-Time Components."
9  *See, e.g.*, Exhibit B at 16, 67, 112-113 and 179.

10     15.    Given the significant logistical complexity and financial commitment involved in the
11 procurement of custom components, the parties recognized that the management of custom
12 components must be treated differently from standard components that do not require customization,
13 are more readily available, and can be interchangeably used for other products. X Corp.'s obligation
14 to accept responsibility for the forecasts provided for the procurement of custom components is
15 grounded in several provisions.

16     16.    Section 4.3.3 of the Master Purchase Agreement demonstrates that X Corp.'s forecasts
17 for custom components were binding. Specifically, it provides:

18
19  [REDACTED]
20

21 Notably, Section 4.3.3 expressly states that forecasts are not binding on X Corp. as to standard
22 components. However, this provision did not state that forecasts were not binding on X Corp. as to
23 custom components; instead, the risk of loss as to custom components would fall on X Corp. by
24 negative inference—if X Corp. was not intended to bear the risk of loss as to custom components,
25 Section 4.3.3 would have expressly stated as much just as it did for standard components.

26     17.    The Product Exhibits attached to the Master Purchase Agreement confirm that the
27 forecasts provided by X Corp. were "[REDACTED]."
28 *See, e.g.*, Exhibit B at 10, 62, 106 and 169. The Product Exhibits further provide that "[REDACTED]

1  ███████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████" *See,*

*e.g., id.* at 10, 62, 106 and 169-170. These provisions further make clear that X Corp. was obligated to provide accurate forecasts for custom components, with Wiwynn required to manage its procurement and inventory in reliance on those forecasts. The parties' agreement to exclude liability for common materials while imposing obligations related to custom components underscores the understanding that X Corp.'s forecasts for custom components were binding. Thus, X Corp. was obligated under Section 4.3.3 of the MPA and pursuant to the Product Exhibits to bear the risk of loss for custom components.

18. The course of performance and course of dealing between the parties over nearly eight years further confirms their mutual understanding that X Corp.'s forecasts for custom components were binding, and thus X Corp. bore the risk of loss for custom components pursuant to Section 4.3.3 of the Master Purchase Agreement and the accompanying Product Exhibits attached and incorporated by reference thereto. Throughout this period, upon receiving forecasts from X Corp., Wiwynn prepared lists of the custom components required to fulfill X Corp.'s forecasted needs. Wiwynn then submitted these lists to X Corp. and only proceeded to place orders for the custom components from its suppliers after receiving X Corp.'s explicit written approval. X Corp. and Wiwynn agreed that, without X Corp.'s formal approval, Wiwynn would not initiate procurement of any custom components. X Corp. further understood that by approving the purchase of the needed components, X Corp. was assuming liability for these components in the event that the components were not used in the manufacture of the products forecasted by X Corp.

19. On multiple occasions, Wiwynn expressly informed X Corp. that, without explicit approval, procurement activities for custom components would not commence. X Corp. provided such approval only after conducting internal reviews to ensure that the forecasts were stable and no changes were necessary. True and correct copies of exemplary email correspondence between the parties in which X Corp., through its then Senior Supply Chain Manager Christopher Kan, approved and assumed liability for the procurement of such custom components are attached hereto as **Exhibit C**.

20. For example, on May 29, 2022, Wiwynn submitted to Mr. Kan a list of ████████ ██████████████████████████████████████████ among other custom components based on earlier forecasts provided by X Corp. Exhibit C at 1-2. Receiving no response from X, Wiwynn deferred the procurement. On June 1, 2022, Wiwynn followed up, seeking X's explicit approval and indicated that, without such approval, Wiwynn would not "████████ ████████" *Id.* at 1. On June 9, 2022, Mr. Kan approved the procurement. *Id.* Notably, in Mr. Kan's response, he confirmed that, before giving any approval, X checked internally "████████ ████████████████" and the approval was only given when the forecast was "██████" *Id.*

21. In addition to approving the purchase of custom components under the Master Purchase Agreement, on several occasions, X Corp. requested that Wiwynn procure excess electrical and electronic components. Wiwynn explicitly informed X Corp. that Wiwynn would not procure these non-custom components (which, unlike the custom components discussed above, were non-binding on X Corp. pursuant to Section 4.3.3 of the MPA) without an explicit written acknowledgement from X Corp. that X Corp. would assume liability for those components. Again and again, X Corp. provided written approval and confirmed that it would assume liability for the excess components, stating in writing that it would "████████████." True and correct copies of exemplary email correspondence between the parties in which X Corp., through its then Senior Supply Chain Manager Christopher Kan, requested and assumed liability for the procurement of such excess components are attached hereto as **Exhibit D**.

22. For example, in response to Mr. Kan's request to purchase certain NICs on February 26, 2022, Wiwynn asked for explicit assurance from X that X would assume liability for ordering such excess components that were not covered by X's forecasts and expressed hesitancy to order any excess components without such explicit assurance. Exhibit D at 1. On March 1, 2022, Mr. Kan confirmed that X Corp. "██████████████████████," even though there was "██████████████████████████." *Id.* Wiwynn did not proceed to purchase excess components until after obtaining X's explicit "██████████████████████████." *Id.*

23. As another example, when instructing Wiwynn to purchase certain excess NIC inventory not covered by X's forecasts, Mr. Kan again reassured Wiwynn that he had "█████ ███████████" and that X would "████████████████████." *Id.* at 3.

24. In each instance discussed above, Wiwynn purchased these non-custom components upon instruction and in reliance on X Corp.'s express promise, as conveyed repeatedly by Mr. Kan, that X Corp. would bear the risk of loss for these non-custom components.

25. The Parties followed this general course of conduct for approximately eight years without issue. Prior to November 2022, X Corp. placed purchase orders six months following any forecasts, and made full payments for all of the products made from the components that Wiwynn purchased only after receiving X Corp.'s confirmation that it would assume liability for those components.

26. Upon information and belief, X Corp. underwent an acquisition process that began in April 2022 and was finalized on October 28, 2022, when Elon Musk completed his $44 billion purchase of the company. At no time before or during this acquisition did X Corp. indicate any intention to deviate from the parties' established course of performance—X Corp. continued to provide forecasts, approve procurement only after confirming its stable needs, and reaffirm its assumption of liability for approved components. Notably, some early forecasts, made slightly more than six months before November 2022, were converted into a purchase order issued on October 27, 2022, further reassuring Wiwynn that X Corp. would continue honoring its obligations under the Master Purchase Agreement and the longstanding course of performance between the parties.

27. Beginning in November 2022 (when new management took over Twitter), however, X Corp. abruptly stopped making any payments to Wiwynn—including for delivered finished products—and failed to respond to multiple communications from Wiwynn inquiring about and demanding the past-due payments for delivered finished products.

28. At this time, Wiwynn had procured approximately $120 million of components, all of which had been expressly approved and authorized by X Corp. in writing for use in the manufacture of products that had been forecasted and/or ordered by X Corp. However, at this time, X Corp. also

1  stopped providing any additional instructions for Wiwynn to manufacture or deliver any finished
2  products to X Corp.—despite Wiwynn's multiple inquiries to X Corp.

3        29.    Despite repeated attempts since November 2022 to resolve the issue, including
4  mediation, X Corp. has refused to accept responsibility for the unused components.

5        30.    In addition to its attempts to resolve the issue of its excess components with X Corp.,
6  Wiwynn immediately attempted to mitigate its damages through various means, including but not
7  limited to cancelling approximately $40 million worth of components that had not yet been delivered
8  to Wiwynn, attempting to sell the delivered but unused components to other third parties, attempting
9  to use the unused components in manufacturing products for other Wiwynn customers, and attempting
10 to repurpose the unused components for Wiwynn's use to absorb the relevant costs itself. Wiwynn
11 has been able to recoup approximately $19 million by re-selling and/or repurposing the unused
12 components that were intended to be used in products for X Corp. However, due to the custom nature
13 of the components, Wiwynn has been and continues to be limited in its ability to resell and reuse a
14 substantial amount of components—which hold a significant total value—despite Wiwynn's best
15 efforts.

16       31.    Wiwynn has incurred and continues to incur significant storage and handling expenses
17 for the remaining unused components.

18       32.    Because it was left with no other options, Wiwynn files this action to recover from X
19 Corp. what X Corp. owes Wiwynn for the unused components.

## COUNT I

### (Breach of Contract Against X Corp.)

22       33.    Wiwynn incorporates by reference and realleges paragraphs 1-32 above of this FAC as
23 if fully set forth herein.

24       34.    As stated above, X Corp. and Wiwynn entered into the Master Purchase Agreement,
25 along with the Product Exhibits attached thereto, which is a valid and binding agreement.

26       35.    Although the parties did not formally execute a final Product Exhibit for F6AWW, the
27 parties began performing the terms of the Product Exhibit for F6AWW in a manner consistent with
28 their longstanding course of performance no later than June 2022.

36. Wiwynn has fully performed all its obligations under the Master Purchase Agreement and the parties' course of performance.

37. X Corp. failed to properly compensate Wiwynn for the price of the unused components purchased by Wiwynn at the direction of X Corp. for the manufacture of custom products for X Corp., breaching Section 4.3.3 of the Master Purchase Agreement as understood by the Parties, as evidenced by the course of performance of the Parties over eight years.

38. X Corp. also engaged in the wrongful termination of the Master Purchase Agreement in violation of at least Section 11.3 of the Master Purchase Agreement, impairing Wiwynn's ability to mitigate procurement risks. Section 11.3 of the Master Purchase Agreement provides:



39. Despite Wiwynn's repeated requests for payment, X Corp. has declined to cure, or attempt to cure, its breach of the Master Purchase Agreement.

40. As a direct and proximate result of X Corp.'s breach, Wiwynn has been damaged in an amount to be proved at trial but in no event less than $61 million, with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT II

**(Promissory Estoppel Against X Corp.)**

41. Wiwynn incorporates by reference and realleges paragraphs 1-40 above of this FAC as if fully set forth herein.

42. In approving the purchase of components by Wiwynn, X Corp. made clear and unambiguous promises to pay Wiwynn a total of at least $120 million should X Corp. not purchase the custom products for which the components were purchased for.

43. The promises made by X Corp. as reflected in the Master Purchase Agreement, the parties' course of performance and emails between the parties were supported by consideration. However, Wiwynn pleads in the alternative that the Court should enforce the promises made by X Corp. to prevent an injustice.

44. In reliance of X Corp.'s promise of payment made in email communications from X separate from X's forecasts, Wiwynn expended resources, including but not limited to purchasing components needed for production of the forecasted custom products.

45. Wiwynn's reliance on X Corp's promise of payment was not only reasonable, but also entirely foreseeable in light of the parties' longstanding practice over nearly eight years of X Corp. separately providing written approval to Wiwynn to purchase components in the amounts that X Corp. had previously forecasted or otherwise requested. X Corp. is well-aware of this because, as reviewed above, Wiwynn repeatedly sought assurance that X Corp. would assume liability for these components and X Corp. repeatedly acquiesced or affirmatively confirmed so—including in writing.

46. In addition, and in reliance on X Corp.'s promise of payment, Wiwynn expended resources, including but not limited to purchasing additional non-custom components based on X Corp.'s express promises to bear the risk of loss as stated by X Corp.'s representative, Mr. Kan, in writing.

47. Because of its reliance on X Corp's promise, Wiwynn has been injured at least in the amount of $61 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT III

**(Breach of the Covenant of Good Faith and Fair Dealing Against X Corp.)**

48. Wiwynn incorporates by reference and realleges paragraphs 1-47 above of this FAC as if fully set forth herein.

49. Implied in the Master Purchase Agreement, as well as the longstanding course of performance between the parties, was a covenant that X Corp. would act in good faith and deal fairly with Wiwynn, that X Corp. would do nothing to interfere with Wiwynn's interests and commitments, and that X Corp. would give at least the same level of consideration to the interests of Wiwynn as X Corp. would give its own interests.

50. X Corp. breached this implied good faith and fair dealing to perform its obligations. X Corp.'s improper objective in so conducting itself was, on information and belief, at all times to delay, and if possible in whole or in part avoid, payment of Wiwynn's legitimate claims.

51. In breach of the implied covenant of good faith and fair dealing, X Corp. committed the acts alleged above for the purpose of consciously depriving Wiwynn from the rights and benefits to which Wiwynn was entitled under the Master Purchase Agreement as well as the longstanding course of performance between the parties.

52. As a direct and proximate result of X Corp.'s conduct, Wiwynn has suffered, and continues to suffer, damages in an amount to be determined at trial, but no less than an amount in excess of $61 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT IV

**(Intentional Misrepresentation Against X Corp.)**

53. Wiwynn incorporates by reference and realleges paragraphs 1-52 above of this FAC as if fully set forth herein.

54. X Corp.—by and through its agents including but not limited to Christopher Kan—represented to Wiwynn that X Corp. would assume liability of the approved components.

55. To the extent X Corp. contends that X Corp. had no intention of fully compensating Wiwynn for the procurement of such components, X Corp. either knew that the representation was false when it made them, or it made the representations recklessly and without regard to their truth.

56. X Corp. intended that Wiwynn rely on the representations in order to induce Wiwynn to procure components on X Corp.'s behalf to provide services for X Corp.

57. Wiwynn reasonably relied on X Corp.'s representations in deciding to procure the approved components, and continuing to do so until X Corp. abruptly ceased payment. X Corp. has refused, and to a large extent ignored, Wiwynn's repeated requests for compensation of the costs.

58. As a direct and proximate result of X Corp.'s conduct, Wiwynn suffered and continues to suffer, damages in an amount to be determined at trial, but no less than an amount in excess of $61 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT V

### (Negligent Misrepresentation Against X Corp.)

59. Wiwynn incorporates by reference and realleges paragraphs 1-58 above of this FAC as if fully set forth herein.

60. X Corp.—by and through its agents including but not limited to Christopher Kan—represented to Wiwynn that X Corp. would assume liability of the approved components.

61. To the extent X Corp. contends that X Corp. had no intention of fully compensating Wiwynn for the procurement of such components, X Corp. made false representations, or made these representations without a reasonable basis for believing them to be true.

62. X Corp. intended that Wiwynn rely on X Corp.'s representations in order to induce Wiwynn to procure components on X Corp.'s behalf to provide services for X Corp.

63. Wiwynn reasonably relied on X Corp.'s representations in deciding to procure the approved components, and continuing to do so until X Corp. abruptly ceased payment. X Corp. has refused, and to a large extent ignored, Wiwynn's repeated requests for compensation of the costs.

64. As a direct and proximate result of X Corp.'s conduct, Wiwynn suffered and continues to suffer, damages in an amount to be determined at trial, but no less than an amount in excess of $61 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## PRAYER FOR RELIEF

WHEREFORE, Wiwynn respectfully prays for judgment and relief as follows:

A. The Court award Wiwynn damages in amount to be determined at trial, but no less than $61 million;

B. The Court award Wiwynn its costs of suit and reasonable attorneys' fees incurred in this action;

C. The Court award pre-judgment and post-judgment interest on all damages awarded; and

D. The Court award such other relief as the Court may deem just and proper.

## JURY DEMAND

Wiwynn demands a trial by jury, pursuant to Fed. R. Civ. P. 38, on all claims set forth in the FAC and all other triable issues.

Dated: October 15, 2024

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ Alekzandir Morton

Alekzandir Morton

Attorneys for Plaintiff
Wiwynn Corporation