1  SAWYER & LABAR LLP
   ADRIAN SAWYER, State Bar No. 203712
2  *sawyer@sawyerlabar.com*
   1700 Montgomery Street, Suite 108
3  San Francisco, California 94111
   Telephone: 415.262.3820
4
5  GIBBS & BRUNS LLP
6  David Sheeren *(pro hac vice)*
   dsheeren@gibbsbruns.com
7  Caitlin Halpern *(pro hac vice)*
   chalpern@gibbsbruns.com
8
9  Mark Doré *(pro hac vice)*
   mdore@gibbsbruns.com
10 Nick Beachy *(pro hac vice)*
   nbeachy@gibbsbruns.com
11
12 1100 Louisiana St # 5300
   Houston, TX 77002
13 713-650-8805 *(phone)*
   713-750-0903 *(fax)*
14
   *Attorneys for Defendant X Corp.*
15

16

17               **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                 **SAN FRANCISCO DIVISION**

20

21 WIWYNN CORPORATION,

22                 Plaintiff,           Case No. 3:24-cv-05322-AGT

23         v.                           **DEFENDANT X CORP.'S MOTION TO
                                        DISMISS WIWYNN'S
24 X CORP.,                             FIRST AMENDED COMPLAINT**

25                 Defendant.           Date:      January 17, 2025
                                        Time:      10:00 a.m.
26                                      Crtrm:     A, 15th Floor

27

28

# CONTENTS

AUTHORITIES ........................................................................................................ ii

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF ISSUES TO BE DECIDED ................................................. 2

III. STATEMENT OF RELEVANT FACTS .......................................................... 2

IV. LEGAL STANDARD .......................................................................................... 4

V. ARGUMENT ........................................................................................................ 5

    A.   Breach of Contract .................................................................................... 5

        1.  X only has to pay for ordered-and-delivered Products ........................... 5

        2.  The MPA does not make X liable for forecasts. ..................................... 7

        3.  X did not wrongfully terminate the MPA. ............................................. 13

    B.   Promissory Estoppel ............................................................................... 14

        1.  The bargained-for MPA displaces Wiwynn's promissory estoppel claim. .......... 14

        2.  X's alleged approvals in the Exhibit C emails do not promise payment. .......... 16

        3.  The one-off Exhibit D emails likewise cannot trump the MPA. ........................ 17

    C.   Breach of the Covenant of Good Faith and Fair Dealing ........................... 18

        1.  Wiwynn's failure to ground its claim in a specific provision is fatal. ............... 18

        2.  The implied covenant may not create new contract duties. ............................. 19

    D.   Intentional and Negligent Misrepresentation ............................................ 20

        1.  The integrated MPA defeats Wiwynn's fraud claims. ..................................... 20

        2.  The economic loss rule bars Wiwynn's fraud claims. ...................................... 20

        3.  Rule 9(b) requires more than Wiwynn's bare allegations. ............................... 21

VI. CONCLUSION .................................................................................................... 23

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

X CORP.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

# AUTHORITIES

2

**Page**

3

## CASES

4

*Alameda Cnty. v. S. Pac. Co.*,
  5 Cal.2d 479 (1961) ................................................................................................ 10

5

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
  7 Cal.4th 503 (1994) .............................................................................................. 21

6

7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 4

8

*Avidity Partners, LLC v. State of California*,
  221 Cal. App. 4th 1180 (2013) .............................................................................. 15

9

10

*Baymiller v. Guarantee Mut. Life Co.*, No. SA CV 99-1566 DOC AN,
  2000 WL 1026565 (C.D. Cal. May 3, 2000) .......................................................... 20

11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 4

12

13

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
  971 F.2d 272 (9th Cir. 1992) ...................................................................... 8, 11, 20

14

*Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF,
  2022 WL 2135746 (N.D. Cal. June 14, 2022) ....................................................... 18

15

16

*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*,
  211 Cal. App. 4th 230 (2012) ................................................................................ 14

17

*Drake v. Option One Mortg. Corp.*,
  No. SACV0901450CJCRNBX, 2010 WL 11464891 (C.D. Cal. Apr. 15, 2010) ............. 15

18

19

*Fast Access Specialty Therapeutics, LLC v. UnitedHealth Grp., Inc.*,
  532 F. Supp. 3d 956 (S.D. Cal. 2021) ................................................................... 16

20

*Foley v. Interactive Data Corp.*,
  47 Cal.3d 654 (1988) ............................................................................................. 21

21

22

*Foster Poultry Farms v. Alkar–Rapidpak–MP Equip., Inc.*,
  868 F. Supp. 2d 983 (E.D. Cal. 2012) ................................................................... 21

23

*Gorovenko v. Activate Clean Energy, LLC*, No. 8:24-CV-00058-JLS-ADS,
  2024 WL 3550489 (C.D. Cal. June 7, 2024) ......................................................... 11

24

25

*Guz v. Bechtel Nat. Inc.*,
  24 Cal. 4th 317 (2000) ........................................................................................... 18

26

*Haggard v. Kimberly Quality Care, Inc.*,
  39 Cal. App. 4th 508 (1995) .................................................................................. 12

27

28

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

*Healy v. Brewster*,
  59 Cal. 2d 455 (1963) ........................................................................................... 14

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ................................................................................. 9

*In re GlenFed, Inc., Secs. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ............................................................................... 22

*Inter-Mark USA, Inc. v. Intuit, Inc.*,
  No. C-07-04178 JCS, 2008 WL 552482 (N.D. Cal. Feb. 27, 2008) ................................. 18

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
  880 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................................... 21

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................................................... 22

*Kroetch v. BAC Home Loan Services*,
  No. C 11-2860 MEJ, 2011 WL 4502350 (N.D. Cal. Sept. 27, 2011) ................................. 18

*Lennar Mare Island, LLC v. Steadfast Ins.*,
  176 F. Supp. 3d 949 (E.D. Cal. 2016) ........................................................... 11

*Love v. The Mail on Sunday*,
  No. CV057798ABCPJWX, 2006 WL 4046180 (C.D. Cal. Aug. 15, 2006) ................................. 18

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
  No. 19-CV-01279-LHK, 2020 WL 836712 (N.D. Cal. Feb. 20, 2020) ............... 19, 22, 23

*Morgan v. Aurora Loan Services, LLC*,
  No. CV124350CASMRWX, 2012 WL 12952304 (C.D. Cal. Aug. 13, 2012) ............ 14, 15

*Newbeck v. Washington Mut. Bank*,
  No. C 09-1599 CW, 2010 WL 3222174 (N.D. Cal. Aug. 13, 2010) .......................... 22, 23

*Nikoonahad v. Rudolph Techs., Inc.*,
  No. C 08-2290 JF (PVT), 2009 WL 1330811 (N.D. Cal. May 13, 2009) ........................ 20

*Openshaw v. FedEx Ground Package Sys., Inc.*,
  576 F. App'x 685 (9th Cir. 2014) ........................................................................... 19

*Oracle USA, Inc. v. XL Glob. Services, Inc.*,
  No. C 09-00537 MHP, 2009 WL 2084154 (N.D. Cal. July 13, 2009) ..................... 21, 22

*Price v. Wells Fargo Bank*,
  213 Cal. App. 3d 465 (1989) ............................................................................... 20

*Seoul Semiconductor Co. v. Finelite, Inc.*,
  694 F. Supp. 3d 1199 (N.D. Cal. 2023) ........................................................... 12

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
  983 F. Supp. 1303 (N.D. Cal. 1997) ........................................................... 22

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

X CORP.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Singelyn v. PNC Bank Nat'l Ass'n,*
    No. EDCV 22-02026-CJC (SPX), 2024 WL 1601857 (C.D. Cal. Jan. 12, 2024) ............. 14

*Sonic-Calabasas A, Inc. v. Moreno,*
    57 Cal.4th 1109 (2013).............................................................................................. 8

*Stanley v. Univ. of S. California,*
    178 F.3d 1069 (9th Cir. 1999)................................................................................ 12

*Stephenson v. Drever,*
    16 Cal.4th 1167 (1997)........................................................................................... 10

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007).................................................................................. 22

*Thompson v. Asimos,*
    6 Cal. App. 5th 970 (2016)..................................................................................... 11

*Thrifty Payless, Inc. v. The Americana at Brand, LLC,*
    218 Cal. App. 4th 1230 (2013)............................................................................... 18

*Vasquez v. Los Angeles Cnty.,*
    487 F.3d 1246 (9th Cir. 2007)................................................................................. 4

*Vess v. Ciba–Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003)................................................................................ 22

*Vizio Inc. v. Gemtek Tech. Co.,*
    No. SACV13160JLSRNBX, 2014 WL 10538995 (C.D. Cal. Aug. 27, 2014) ............. 9, 13

*W. Am. Ins. v. Shaghal Ltd.,* No. CV2107751CJCJPRX,
    2022 WL 17370532 (C.D. Cal. June 23, 2022)................................................................. 18

*World Health & Educ. Found. v. Carolina Cas. Ins. Co.,*
    612 F. Supp. 2d 1089 (N.D. Cal. 2009) ........................................................................ 20

**STATUTES**

CAL. CIV. CODE § 1639 ........................................................................................... 11

CAL. CIV. CODE § 3300 ........................................................................................... 13

CAL. CIV. PROC. CODE § 1856 .................................................................................. 11

CAL. COM. CODE § 1303 .......................................................................................... 11

CAL. COM. CODE § 1304 .......................................................................................... 19

CAL. COM. CODE § 2202 .......................................................................................... 11

CAL. COM. CODE § 2509 ....................................................................................... 9, 10

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## OTHER AUTHORITIES

*Free on Board*, BLACK'S LAW DICTIONARY (12th ed. 2024) ............................................................... 9

## RULES

FED. R. CIV. P. 10(c) ............................................................................................................ 5

FED. R. CIV. P. 12(b)(6) ...................................................................................................... 4

FED. R. CIV. PROC. 9 .......................................................................................................... 22

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

X CORP.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 10:00 a.m. on January 17, 2025, or as soon thereafter as the matter may be heard, before Hon. Alex G. Tse, Courtroom A, Floor 15, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant X Corp. will and hereby does move for an order dismissing Plaintiff Wiwynn Corporation's First Amended Complaint with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion is based on this Notice of Motion and accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, the oral argument of counsel, and such other materials and evidence as may be presented to the Court.

Defendant requests the Court dismiss Plaintiff's First Amended Complaint with prejudice because Plaintiff fails to state a claim upon which relief can be granted.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Wiwynn purchases computer components to build web servers for its many customers, including X (formerly Twitter). In 2022, following delays in Wiwynn's supply chain and decreases in X's demand, X did not order as many servers as Wiwynn had hoped. That should have been the end of the story. Wiwynn had only received X's ***non-binding forecasts***, so X was not required to buy any servers, and no sale was ever made. If Wiwynn had excess inventory, it could have just returned, repurposed, or resold the brand-new components elsewhere. Instead, Wiwynn sued.

Wiwynn has no viable claim. Under the parties' contract, X only agreed to pay for fully assembled and delivered servers, not piecemeal components. Of course, Wiwynn had to order parts before it could build the final product. That's why, consistent with the contract, X sent Wiwynn ***non-binding*** forecasts of its anticipated demand. It's also why, when Wiwynn compiled lists of components contemplated by X's forecasts, X reviewed them to make sure that the component lists matched up with its estimates. These processes aided Wiwynn in its efforts to timely fill X's orders and, in turn, helped ensure that X got the servers it needed without supply-chain delays. But neither the forecasts nor the component lists were promises of future purchases. X still had to issue a

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

1    "Purchase Order" to consummate the sale and trigger X's payment obligation under the parties'

2    Master Purchase Agreement. Until then, Wiwynn assumed the risk that X's demand would change.

## II.    STATEMENT OF ISSUES TO BE DECIDED

4        Whether Wiwynn has alleged facts that state a plausible claim for (1) breach of contract,

5    (2) promissory estoppel, (3) breach of the implied covenant of good faith and fair dealing,

6    (4) intentional misrepresentation, or (5) negligent misrepresentation.

## III.    STATEMENT OF RELEVANT FACTS

8        Wiwynn is an "original design manufacturer," a company that designs and assembles

9    computer equipment. Wiwynn sells internet servers to companies like X, which require large

10   amounts of processing power to keep their websites running. X started buying servers from Wiwynn

11   around 2014, when the parties entered into a written Master Purchase Agreement ("**MPA**"). First

12   Am. Compl. ("**FAC**") Ex. A (ECF No. 26-3).

13       The MPA does not require X to buy anything from Wiwynn. Consistent with the standard

14   use of such agreements, it simply outlines the process through which X *could* purchase servers from

15   Wiwynn. In the MPA, Wiwynn agreed to sell, provide, and deliver "Products." MPA at 1–2.

16   "**Products**" are "items identified on subsequent Purchase Orders and Product Exhibits issued by

17   [X]." *Id.* A "**Product Exhibit**" provides server design specifications, technical requirements,

18   component prices, and so on. *Id.* "**Purchase Order**" means X's "written order to [Wiwynn] to

19   purchase Products, which might include (but [are] not limited to) Product descriptions, quantities,

20   price, delivery dates and shipment methods." *Id.* The MPA and subsequent Product Exhibits

21   "constitute[] the complete and exclusive understanding and agreement of the parties." *Id.* § 14.13.

22   Any "waiver, modification or amendment" of the MPA's terms must be "in writing and signed." *Id.*

23       Under the MPA, only a Purchase Order creates a binding commitment to take and pay for

24   Products. The parties agreed that "[f]or Products *delivered by Supplier and accepted by [X]*, [X]

25   will pay Supplier the price specified in the applicable Purchase Order(s)." *Id.* § 2.1.[1] Specifically,

26   "Supplier shall deliver the Products on the delivery date(s) stated in a Purchase Order," at the

27

28   ─────────────────
     [1] Emphasis is added throughout unless otherwise noted.

destination stated in the Purchase Order. *Id.* § 2.2. Then, "within [45] days following receipt of Product," "[X] will pay each invoice, referencing [X's] Purchase Order." MPA § 2.4.[2] No other provision triggers payment by X. To the contrary, the MPA states that "[u]nless otherwise specified in this Agreement, ***[X] will not reimburse Supplier for any expenses incurred by Supplier*** in connection with its obligations." MPA § 2.4. The Complaint admits that X never issued any Purchase Orders for the components at issue. *See* FAC ¶ 28.

The MPA also contemplates a process by which X could provide Wiwynn ***non-binding*** forecasts of its estimated future demand for servers. MPA § 4.3.3 (Forecast). The MPA makes clear that any "[f]orecast provided by [X] for Supplier's standard Components are non-binding." *See id.* As to "non-standard Components (any components that are customized per [X's] request)," the MPA states only that "[X] anticipates providing [Wiwynn] with a six-month rolling forecast." *Id.* The parties' Product Exhibits, incorporated into the contract, confirm that these six-month rolling forecasts for non-standard components[3] are not binding. *See* FAC Ex. B ("**Product Exhibits**") at 10; 62; 106; 169 ("[X] shall provide [Wiwynn] with a rolling ***non-binding*** six (6) month forecast ... subject to Section 4.3.3 of the MPA."). X's forecasts were just that: forecasts. Further, after X provided its ***non-binding*** forecasts to Wiwynn, the Product Exhibits required Wiwynn to share with X a list of components necessary to meet those forecasts before placing orders for those components with vendors. *E.g.*, Product Exhibits at 62–63; 107; 170.[4] This sequence protected X by, for example, ensuring that Wiwynn would have the *correct* components on hand to fulfill X's Purchase Orders, *if and when* X ultimately decided to issue such Purchase Orders.

---

[2] *See also id.* § 4.1 ("Unless otherwise provided for in a Purchase Order by the Parties in writing, [X] shall pay all undisputed invoice amounts for accepted Products within forty-five (45) days from Product delivery. Supplier shall send a separate invoice for each delivery under a Purchase Order, and each invoice must show, but not limited to, [X's] Purchase Order number ….").

[3] *See* MPA § 4.3.4 ("A list of non-standard, custom components for each Product is set forth in the individual Product Exhibits.").

[4] "Prior to placing orders with the vendors to meet [X's] forecast, Supplier shall provide [X] with LLK (Long Leadtime Kit) for the long lead time components. Supplier will similarly provide SLK (Short Leadtime Kit) for short lead time components prior to placing purchase orders with vendors." *Id.* at 107.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Consistent with these contractual provisions, X regularly provided forecasts to Wiwynn and updated them as its anticipated server needs changed. *See* FAC ¶ 18. In turn, Wiwynn alleges that "upon receiving forecasts from X Corp., Wiwynn prepared lists of the custom components required to fulfill X Corp.'s forecasted needs" (*id.*)—precisely what Wiwynn was required to do under the Product Exhibits. *See* Product Exhibits at 62–63; 107; 170. **Exhibit C** to the Complaint includes uncontroversial email exchanges illustrating this required back-and-forth on X's non-binding forecasts and Wiwynn's component lists, including a discussion regarding whether X anticipated "any changes in the forecast that will impact the quantities." FAC Ex. C at 1.[5]

Nothing in the MPA or the Product Exhibits, however, provides that by sharing a forecast, X was promising to purchase servers or pay for components. Under the contract's plain terms, X becomes bound to pay at a clear and unambiguous point: when Wiwynn delivers Products pursuant to a Purchase Order. This is typical for agreements like the MPA, which streamline future purchases between the parties by allocating the inherent supply-chain risks of commercial transactions. In the arm's-length MPA, Wiwynn assumed the risk that X would not issue Purchase Orders for the full scope of its non-binding forecasts. When X's demands changed, it did not issue Purchase Orders, as was its right under the MPA.

## IV.    LEGAL STANDARD

Under Rule 12(b)(6), a cause of action must be dismissed if it fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A complaint must have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Thus, Wiwynn must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, "conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper motion to dismiss." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3800
www.sawyerlabar.com

---

[5] FAC Ex. D, in contrast, contains an isolated email exchange, addressing a minor component, that is completely unrelated to Wiwynn's theory that X's *non-binding* forecasts were actually binding.

# V.    ARGUMENT

Wiwynn's contract claim fails because it admittedly never received Purchase Orders for the components at issue. Dismissal is also warranted for Wiwynn's four extracontractual claims, which draw on forecasts, component lists, informal emails, and other extrinsic allegations. The claim for promissory estoppel fails to plead necessary elements and is barred by the parties' contract in any case. The claim for breach of the implied covenant of good faith and fair dealing is similarly deficient and omits any reference to the contract provisions that X allegedly frustrated. Finally, the claims for intentional and negligent misrepresentation run headlong into the heightened pleading standard, the fully integrated contract, and the economic loss rule.

## A.    *Breach of Contract*

The 12-page MPA is straightforward: Wiwynn gets paid after receiving a Purchase Order and delivering a Product. Wiwynn agrees neither occurred. Applying the unambiguous MPA and Products Exhibits to these pleaded facts, Wiwynn cannot prevail on any breach-of-contract claim, however framed.[6]

### 1.    X only has to pay for ordered-and-delivered Products.

Under the contract's plain terms, X has a duty to pay only if two conditions are satisfied: (1) X issues a formal Purchase Order, and (2) X accepts delivery of a finished Product.

***First, X must issue a Purchase Order.*** A "Purchase Order" is defined as X's "written order to [Wiwynn] to purchase Products, which might include (but not limited to) Product descriptions, quantities, price, delivery dates and shipment methods." MPA at 2; *id.* § 2.4 (Payment) ("[X] will pay each invoice, referencing [X's] Purchase Order…."); *id.* § 4.1 (Payment Terms and Billing) (Wiwynn's invoices "must show … [X's] Purchase Order number.").

***Second, Wiwynn must deliver a Product.*** *Id.* § 2.1 (Prices) ("For Products delivered by Supplier and accepted by [X], [X] will pay Supplier the price specified in the applicable Purchase Order(s)."); *see also id.* § 2.4 (Payment) ("[X] will pay each invoice … within forty-five (45) days

---

[6] The MPA and Product Exhibits are attached to Wiwynn's pleadings and are thus properly before the Court on this motion to dismiss. FAC Exs. A and B; FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

following receipt of Product."); *id.* § 4.1 (Payment Terms and Billing) ("[X] shall pay all undisputed invoice amounts for accepted products within forty-five (45) days from Product delivery.").

**Wiwynn concedes that no Purchase Orders were issued, and no Products were delivered.** No matter how Wiwynn spins X's "approvals" of component lists, FAC ¶ 26, "approvals" are not Purchase Orders. Indeed, Wiwynn alleges that X "stopped providing … instructions for Wiwynn to manufacture or deliver any finished products to X Corp." *Id.* ¶ 28. In doing so, Wiwynn pleads its way out of court. Without a Purchase Order, there is no price term, no payment term, no invoice, no duty to negotiate a disposition of materials, and no liability for Wiwynn's inventory. *See* MPA §§ 2.1; 2.4; 4.1; 4.3.1; 4.3.4.

Nor has Wiwynn alleged that it *delivered* any finished Products.[7] Rather, this case concerns excess components that Wiwynn alleges were ordered for, but were never assembled into, X servers. *See* FAC ¶ 32. The MPA makes X responsible for leftover components in exactly one circumstance—when X *cancels a Purchase Order* for "custom manufactured Products." *See* MPA § 4.3.4 ("Cancellations"). In that case, X must "negotiate in good faith with Supplier for the disposition of materials that Supplier cannot otherwise sell on the open market and shall be liable for any and all remaining materials that Supplier is unable to sell on the open market." *Id.* Once again, a Purchase Order is required. And not just any Purchase Order—the provision is limited to *canceled* Purchase Orders for *custom* Products with components that *cannot be sold*. Then, and only then, X assumes liability for excess materials. Here, there was no Purchase Order, let alone a canceled one.

Wiwynn cannot point to any part of the MPA making X liable for unused components without a Purchase Order, because none exists. Indeed, the MPA provides that "[u]nless otherwise specified in this Agreement, [X] will not reimburse Supplier for any expenses incurred by Supplier in connection with its obligations." MPA § 2.4.[8]

---

[7] Wiwynn's one-off reference to "past-due payments for delivered finished products" is a red herring. FAC ¶ 27. Wiwynn neglects to mention that the parties resolved that matter long before suit was filed. None of Wiwynn's claims seek payment for delivered Products.

[8] Closing the loop, Section 2.4 also cabins X's payment duties to "undisputed fees" set out in invoices from Wiwynn that reference specific Purchase Orders issued by X. *See id.* ("Payment");

Under the unambiguous MPA, Purchase Orders are a necessary precondition to X's liability. Wiwynn acknowledges that no Purchase Orders were issued, and no Products were delivered. Accordingly, Wiwynn cannot state a viable contract claim.[9]

### 2.    The MPA does not make X liable for forecasts.

Lacking the requisite Purchase Orders, Wiwynn hangs its case on forecasts. Wiwynn oscillates between two theories: In one theory, X's *forecasts* are claimed to be binding; in the other, X is allegedly bound by *emails* approving Wiwynn's component lists. *Compare* FAC ¶ 16 (contending *forecasts* themselves are binding per MPA Section 4.3.3) *with id.* ¶ 18 (claiming X's email approvals of component lists *based on X's forecasts* make X liable). These theories are mutually incompatible, and neither remedies the fatal flaw in Wiwynn's case: No plausible reading of the MPA puts X on the hook for Products it never purchased, much less unassembled components.

### a.    Wiwynn's interpretation is incompatible with the contract.

Wiwynn's textual argument is that Section 4.3.3 "demonstrates" that X's "forecasts for custom components were binding." *See* FAC ¶ 16. Based only on "negative inference," Wiwynn would impose total liability on X for *all* forecasted custom components—liability that would attach as soon as X sends a forecast. *Id.* Yet the contract, as supplemented by the Product Exhibits,[10] says the exact opposite: *No* forecasts are binding.

The MPA refers only to "non-binding" forecasts for standard components, not to "binding" forecasts of any kind.[11] MPA § 4.3.3. As for custom components, Section 4.3.3 simply says that X

---

*see also id.* § 2.1 ("For Products delivered by Supplier and accepted by [X], [X] will pay Supplier the price specified in the applicable Purchase Order(s).").

[9] This defect cannot be cured by further amendment, as Wiwynn cannot in good faith allege that Purchase Orders were issued for the components at issue.

[10] Each Product Exhibit references and is incorporated into the MPA. *E.g.*, Product Exhibits at 1. They also provide that they "may not be changed except by a written agreement signed by an authorized representative from each party." *Id.* With certain exceptions not applicable here, the Product Exhibits "shall control" if they and the MPA conflict. *Id.*

[11] The full MPA provision reads: "Forecast provided by [X] for [Wiwynn's] standard Components are non-binding. For non-standard Components (any Components that are customized per [X's] request), [X] anticipates providing [Wiwynn] with a six-month rolling forecast." MPA § 4.3.3.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1   "anticipates providing" a "rolling" forecast. *Id.* The duty Wiwynn seeks—one that requires X to pay

2   for components based only on estimates of X's future needs—is nowhere to be found.

3        If the MPA closes the door on Wiwynn's theory, the Product Exhibits lock it shut.

4   The Product Exhibits supplement the MPA and make clear that, for all forecasted components, "[X]

5   shall provide Supplier with a rolling ***non-binding six (6) month forecast****….*" *Id.* at 10; 62; 106; 169.

6   On this issue, the Product Exhibits are entirely consistent with the MPA, but even if there were an

7   inconsistency, the Product Exhibits control,[12] and they expressly refute Wiwynn's reading.

8        The parties nowhere agreed to make X liable for forecasts or associated component lists; to

9   the contrary, they expressly agreed that forecasts were ***non-binding****.* "[C]ourts may not rewrite

10   agreements and impose terms to which neither party has agreed." *Sonic-Calabasas A, Inc. v.*

11   *Moreno*, 57 Cal.4th 1109, 1143 (2013). And courts consider and construe contracts as a whole to

12   avoid rendering provisions meaningless. *See Brinderson-Newberg Joint Venture v. Pac. Erectors,*

13   *Inc.*, 971 F.2d 272, 278–79 (9th Cir. 1992).

14        Adding liability for forecasts would disrupt the MPA's calibrated processes for buying and

15   selling Products. Nor could such liability be harmonized with the MPA's other terms. To name a few

16   examples, there is no squaring X's purported liability for forecasted-but-unordered custom

17   components with X's right to "immediately terminate" the MPA "for any reason or no reason," after

18   which X need only pay any amounts due for "Products delivered or in-transit" before termination.

19   MPA §§ 11.3; 11.4.1. Additionally, the Purchase Order-cancellation provision discussed above,

20   which defines the sole avenue for X to incur liability for excess components, would be rendered

21   meaningless because X would be equally liable *before it places an order*. *See id.* § 4.3.4. The

22   integration clause would be superfluous as well, since enforcing unstated terms would violate the

23   parties' agreement that the MPA is their "complete and exclusive understanding" as to its "subject

24   matter" unless they sign a separate, written modification. *See id.* § 14.13.

25        In one remarkably on-point case, a California court rejected a supplier's similar attempt to

26   fashion binding purchases from non-binding forecasts. *See Vizio Inc. v. Gemtek Tech. Co.*, No.

27   ──────────────────

28   [12] *See* Product Exhibits at 1; 51; 95; 150 ("In the event of any conflict or inconsistency between
the terms of this Product Exhibit and the MPA, the Product Exhibit shall control.").

SACV13160JLSRNBX, 2014 WL 10538995, at *2–3 (C.D. Cal. Aug. 27, 2014). The facts were nearly identical to those alleged by Wiwynn: Vizio and Gemtek entered a master supply agreement for the sale of electronics; Vizio provided purchase forecasts; Gemtek acquired inventory based on them; Vizio never issued a purchase order for the forecasted inventory; and Gemtek claimed damages as a result. *See id.* The court found that the contract did not "permit [] recovery for leftover components except where Vizio submitted a purchase order." *Id.* at *4. The same is true here.

The contract at issue in *Vizio* was strikingly similar to the MPA. For example, the *Vizio* court called attention to the defined terms "Purchase Orders" and "Products":

> If the forecasts were *themselves* purchase orders, as Gemtek claims, the contract's very detailed provisions regarding purchase orders would become surplusage. Moreover, numerous important provisions of the Supply Agreement become meaningless without the use of purchase orders, again rendering large swaths of the agreement surplusage under Gemtek's reading. Even the foundational term "Products," for instance, is defined as items "specified in a Purchase Order by Vizio."

*Id. at* *3 (emphasis original). The MPA uses the same terms in the same way. *See* MPA at 2 (defining "Products" to include items "identified on subsequent Purchase Orders"). And the MPA is hardly unique in this regard. "[I]n the computer industry generally, an 'agreement to purchase' has far different consequences than an actual 'purchase order.' While the former represents a mere forecast of anticipated product demand, the latter is an actual obligation to buy." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (citation omitted).

### b.    The contract's text refutes Wiwynn's attempt to re-allocate risk.

Finding no express duty to *pay* for components, Wiwynn artfully pleads a "risk of loss" on X's part. *E.g.*, FAC ¶ 16. But the MPA and the law impose that risk on Wiwynn, not X. The MPA provides that Wiwynn "shall deliver the Products … at FOB destination," MPA § 2.2, which means Wiwynn, as seller, "is required to pay the freight charges *and bear the risk of loss* as far as the buyer's named destination." *Free on Board*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also* CAL. COM. CODE § 2509(1)(b) (Where seller is required to deliver to a particular place, "the risk of loss passes to the buyer" when the goods are tendered for delivery.). Even clearer, the Product

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Exhibits state expressly that Wiwynn "retains title" and "will bear all risk of loss" to Products "until delivery." Product Exhibits at 11; 63; 107; 171.

Of course, parties may modify the risk-of-loss defaults by contract. *See* Cal. Com. Code § 2509(4). Here, the parties did. Rather than leaving Wiwynn with *all* risk for unused components, the parties bargained for a single, narrow deviation: In the cancellation provision of Section 4.3.4, discussed above, the parties agreed that X may have leftover-component liability when Products are ordered through a Purchase Order and then canceled—*not* when Products are merely forecasted and never ordered. *See* MPA § 4.3.4.

Where parties put obligations in writing, courts presume that "having expressed some they have expressed all of the conditions by which they intended to be bound," and thus courts should not "enlarge them by implication." *Alameda Cnty. v. S. Pac. Co.*, 5 Cal.2d 479, 488 (1961). By the same token, where express terms specify the rights and duties flowing from a particular event (here, Wiwynn acquiring excess components), that "tends to negate any inference that the parties also intended another consequence to flow from the same event." *Stephenson v. Drever*, 16 Cal.4th 1167, 1175–1176 (1997).[13]

In short, if the parties meant to shift even more risk to X, they would have: Section 4.3.4 shows they knew how. The MPA answers the operative question not by "negative inference" but by the express terms of the very next section—one Wiwynn completely ignores.

### c.    An alleged course of performance cannot overrule the contract.

Lacking a plausible basis for its claims in the contract's text, Wiwynn seeks refuge in the parties' purported course of performance. *See* FAC ¶ 18. The theory is this: When X provided forecasts, Wiwynn "prepared lists of the custom components required to fulfill X Corp.'s forecasted needs" and *only* ordered those components from its suppliers after X formally approved the lists. *Id.* In fact, Wiwynn alleges that the parties "agreed that, without X Corp.'s formal approval, Wiwynn would not initiate procurement of any custom components." *Id.* Going further still, Wiwynn alleges

---

[13] Because the contract parties in *Alameda County* "carefully provided in express terms" for certain indemnity obligations, the court concluded that, if they "intended to bind" a party to the purportedly implied duty, they "would have likewise made express provision for" it. *Id.*

Sawyer & Labar LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

that X "understood that by approving the purchase of the needed components, X Corp. was assuming liability for these components" if they went unused. *Id.*

Boiled down, the course-of-performance allegation is that (i) Wiwynn conditioned its orders of forecasted components on express approval by X, and (ii) such approval shifted the "risk of loss" to X. But as explained above, X is not bound by forecasts or the component lists related to them. Wiwynn may not conjure brand-new duties based on an alleged course of performance.

Courts interpreting written contracts ascertain the parties' intent from the written terms alone, if possible. CAL. CIV. CODE § 1639. "Express terms prevail over course of performance" in the event of inconsistency. CAL. COM. CODE § 1303. Moreover, the MPA is an integrated contract: As to its "subject matter," it "constitutes the complete and exclusive understanding and agreement of the parties" and "supersedes all prior understandings and agreements, whether written or oral." MPA § 14.13. For integrated contracts, "parol evidence may not be used to vary or contradict the words the parties agreed upon, since an integrated writing must be taken as the best and final expression of their intent." *Thompson v. Asimos*, 6 Cal. App. 5th 970, 987 (2016) (citing CAL. CIV. PROC. CODE § 1856 and CAL. COM. CODE § 2202). A course of performance, then, may "explain or supplement" but not "contradict the terms of an integrated agreement." *Lennar Mare Island, LLC v. Steadfast Ins.,* 176 F. Supp. 3d 949, 966–67 (E.D. Cal. 2016).

Wiwynn does not seek to *explain* the meaning of a contract term—it wants to *add a new one*. Nothing in the MPA makes X liable for components it never ordered by issuing a Purchase Order. Wiwynn's proffered "parol evidence of terms not specifically included in the written contract is not admissible." *Gorovenko v. Activate Clean Energy, LLC*, No. 8:24-CV-00058-JLS-ADS, 2024 WL 3550489, at *2–3 (C.D. Cal. June 7, 2024) (citing *Brinderson-Newberg*, 971 F.2d at 277).

Further, Wiwynn's duty to provide X lists of components to X before ordering them protected X and is entirely consistent with the MPA's other terms, which require Wiwynn to maintain adequate inventory to timely fill X's Purchase Orders. The Product Exhibits provide that Wiwynn "*will maintain* an inventory of raw materials and components necessary to manufacture products *in accordance with the forecasts.*" *E.g.*, Product Exhibits at 10; *see also id.* at 56–57 ("Supplier *will trigger* material demand based on material lead-time, [X] project target schedule, manufacturing

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

process and material screening and preparation…. Supplier routinely purchases products and holds inventory to cater to [X] demand….”). In any event, while the Product Exhibits required Wiwynn to share component list with X before ordering components from vendors, nowhere do they say that X's confirmation of the accuracy of the component lists convert its non-binding forecasts into binding ones. *See id.* at 62–63; 107; 170.

The MPA's core bargain is for Wiwynn to deliver the Products that X orders. *See* MPA at 1 (“Supplier desires to sell, provide and deliver [] Products to [X.]”). Wiwynn must do so timely— generally, by the date specified in X's Purchase Order. *See id.* § 2.2. The Product Exhibits go further, stating that “to the extent demand is *forecasted*, Supplier agrees to ship product within six (6) weeks from purchase order receipt date.” *E.g.*, Product Exhibits at 11.

To timely fill orders, Wiwynn necessarily must source components in advance. The onus is on Wiwynn, not its customers, to recognize and solve shortages of forecasted components. *See* MPA § 6.2 (Wiwynn must inform X of any “materials or manufacturing capacity constraint that could adversely affect Supplier's ability to meet [X's] requirements. … Supplier will maintain additional supply to cover fallout in the manufacturing process. Supplier will also position purchase orders and forecasts with its sub-tier suppliers in order to maintain the quoted delivery lead-time of the Product to [X].”); Product Exhibits at 10 (“If Supplier becomes aware that it may encounter difficulty meeting any forecast quantity of products, it shall immediately notify [X], providing details of the expected shortfall, causes of the shortfall and proposed solution.”).

The integrated MPA also requires any “waiver, modification or amendment” of its terms to be “in writing and signed” by the parties. MPA § 14.13. A contract that “excludes modification or rescission except by a signed writing … cannot be otherwise modified or rescinded.” CAL. COM. CODE § 2209. Accordingly, a “plaintiff cannot rely on post-contract implied terms when [a] contract require[s] all modifications be written.” *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1078 (9th Cir. 1999) (citing *Haggard v. Kimberly Quality Care, Inc.,* 39 Cal. App. 4th 508, 516–521 (1995)); *see also Seoul Semiconductor Co. v. Finelite, Inc.*, 694 F. Supp. 3d 1199, 1211 (N.D. Cal. 2023) (declining to consider course of conduct where the contract was integrated and where modifications required a signed writing).

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Once again, *Vizio* is on point. Like the MPA, the contract in *Vizio* prohibited unsigned modifications, which foreclosed Gemtek's course-of-performance arguments:

> [While] course of performance is ordinarily relevant in determining whether the parties have waived or modified any contractual term that is inconsistent with their performance … this is not the case where the parties' signed agreement excludes modification except by a signed writing[.] Because the Supply Agreement's provisions concerning purchase orders may not be supplemented or modified by the parties' course of performance, ***Gemtek cannot recover for leftover product where it did not receive a purchase order***.

*Visio*, 2014 WL 10538995, at *3.

Wiwynn cannot salvage its breach of contract claim with extracontractual allegations. The plain terms of the integrated MPA govern. Under the MPA, X can be bound only by fulfilled Purchase Orders, not by pre-purchase, non-binding forecasts.[14]

### 3.    X did not wrongfully terminate the MPA.

Finally, X did not breach Section 11.3 by "wrongful termination." X did not terminate the MPA at all. Wiwynn includes a conclusory allegation that X terminated the MPA without sufficient notice, FAC ¶ 38, but never alleges when, how, or with what type of notice X terminated the contract. Regardless, contract damages must flow from the specific duty breached and be proximately caused by that breach. *See* CAL. CIV. CODE § 3300.[15] If X terminated the contract (sometime, somehow) without notice, then it must be that Wiwynn's damages were *caused by* that lack of notice. In other words, it comes down to timing—that given 30 days' notice, Wiwynn would not have suffered its purported damages. Yet there is no such allegation; *all* of Wiwynn's alleged damages stem from X's

---

[14] As noted above, the FAC cites two distinct types of emails between X and Wiwynn. Wiwynn alleges that, "[i]n addition to approving the purchase of custom components under the [MPA]"— the basis for Wiwynn's contract claim and allegedly supported by the **Exhibit C** emails—X separately "requested and assumed liability" for a small number of standard, non-custom components. FAC ¶ 21. The latter emails are **Exhibit D** to the FAC and are addressed with the promissory estoppel and misrepresentation claims discussed below. Wiwynn appears not to allege that the isolated emails in **Exhibit D** give rise to a breach of contract claim. And, for good reason: such a claim would fail because the fully integrated MPA only requires X to pay for Products ordered through formal Purchase Orders.

[15] The MPA waives any indirect, special, or consequential damages. MPA § 9.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1   allegedly wrongful failure to purchase excess components. Without it, Wiwynn cannot state a claim,

2   as the termination provisions allow X to "immediately terminate" the MPA and any open Purchase

3   Orders "at any time, for any reason or no reason," after which X is liable only for amounts due for

4   "Products delivered or in-transit," which none are alleged to have been. MPA §§ 11.3; 11.4.1.

5        **B.    Promissory Estoppel**

6        In its next claim, Wiwynn veers from the contract into the land of promissory estoppel. *See*

7   FAC ¶¶ 41–47. Wiwynn alleges that "[i]n approving the purchase of components by Wiwynn, X

8   Corp. made clear and unambiguous promises to pay Wiwynn a total of at least $120 million should

9   X Corp. not purchase the custom products for which the components were purchased." *Id.* ¶ 42.

10       Wiwynn has failed to state a claim for promissory estoppel because the MPA displaces any

11  such claim and because it has insufficiently pleaded essential elements of reliance and promise.

12       **1.    The bargained-for MPA displaces Wiwynn's promissory estoppel claim.**

13       California law treats contract and promissory estoppel claims "not only as distinct or

14  alternative theories of recovery but also as mutually exclusive." *Douglas E. Barnhart, Inc. v. CMC*

15  *Fabricators, Inc.*, 211 Cal. App. 4th 230, 243 (2012). "[W]here the promisee's reliance was

16  bargained for, the law of consideration applies; and it is only where the reliance was unbargained

17  for that there is room for application of the doctrine of promissory estoppel." *Singelyn v. PNC Bank*

18  *Nat'l Ass'n*, No. EDCV 22-02026-CJC (SPX), 2024 WL 1601857, at *4 (C.D. Cal. Jan. 12, 2024)

19  (quoting *Healy v. Brewster*, 59 Cal. 2d 455, 463 (1963)). If a promissory estoppel claim "relies upon

20  obligations arising out of a written agreement for which there was bargained-for consideration," that

21  claim "instead must be pleaded as one for breach of the bargained-for contract." *Id.* Put another way,

22  "traditional contract principles" govern if the alleged promise "occurred in the context of a

23  bargained-for exchange between the parties." *Morgan v. Aurora Loan Services, LLC*, No.

24  CV124350CASMRWX, 2012 WL 12952304, at *6 (C.D. Cal. Aug. 13, 2012).

25       Here, X's alleged promises plainly occurred in the context of the bargained-for MPA.

26  Wiwynn says as much, claiming that X's promises were "reflected in the [MPA]" and "supported

27  by consideration." FAC ¶ 43. The fully integrated MPA is the "complete and exclusive

28  understanding" of the parties as to that "subject matter." MPA § 14.13. If the parties wished to waive,

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1  modify, or amend part of that "exclusive understanding," they had to do so by signed writing. *Id.*

2  Since Wiwynn has "alleged the existence of a contract that covers the dispute over" liability for

3  forecasted Products and components, its "claim for promissory estoppel fails as a matter of law."

4  *See Drake v. Option One Mortg. Corp.*, No. SACV0901450CJCRNBX, 2010 WL 11464891, at *4–

5  5 (C.D. Cal. Apr. 15, 2010).

6      The MPA also prevents Wiwynn from adequately alleging the essential element of reliance.[16]

7  Wiwynn's only alleged reliance ("purchasing components needed for production" of X servers) was

8  contractually bargained for. *See* FAC ¶¶ 44, 46. The MPA was supported by mutual consideration:

9  Wiwynn was required to fulfill Purchase Orders, and X was required to pay for them. *See* MPA §§

10  2.2, 2.4. To uphold its side of the bargain, Wiwynn had to purchase components so that it could

11  timely fulfill Purchase Orders if and when they were issued.[17] Wiwynn's performance (purchasing

12  components) formed part of the contractual consideration. *Cf. Avidity Partners, LLC v. State of*

13  *California*, 221 Cal. App. 4th 1180, 1208–09 (2013) (Plaintiff brought contract and promissory

14  estoppel claims; Plaintiff's alleged "reliance on certain alleged promises" was the same as its alleged

15  "duties under the Agreement"; and so Plaintiff's "claim of promissory estoppel fail[ed] because the

16  reliance it claims was bargained-for consideration under the Agreement."). There can be no

17  promissory estoppel claim if a plaintiff is "already contractually obligated" to do the acts alleged as

18  reliance. *See Morgan*, 2012 WL 12952304, at *6.

19      Top to bottom, Wiwynn's promissory estoppel allegations describe the parties' performance

20  under a written agreement. Such claims sound in contract, not promissory estoppel.

21

22

---

23  [16] "The elements of a promissory estoppel claim are (1) a promise clear and unambiguous in its

24  terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his

25  reliance." *Jones v. Wachovia Bank*, 230 Cal. App. 4th 935, 944–945 (2014).

26  [17] *See, e.g.*, Product Exhibits at 11 ("Supplier will maintain an inventory of raw materials and components necessary to manufacture products in accordance with the forecasts."); *id.* ("[T]o the

27  extent demand is forecasted, Supplier agrees to ship product" within six weeks of X's order.); MPA § 6.2 ("Supplier will maintain additional supply to cover fallout in the manufacturing

28  process" and "position purchase orders" with its vendors "to maintain the quoted delivery lead time of the product to [X].").

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**2.    X's alleged approvals in the Exhibit C emails do not promise payment.**

Even if Wiwynn could overcome the integrated agreement, X's email responses to Wiwynn's lists of forecasted components are not "clear and unambiguous" promises of payment. Wiwynn alleges that "[i]n approving the purchase of unused custom and non-custom components," X "made a clear and unambiguous promise to pay Wiwynn a total of at least $120 million." FAC ¶ 42. But notice the sleight of hand. The allegation is *not* that X promised to pay for $120 million of components—the FAC alleges no facts indicating any such promise, let alone a "clear and unambiguous" one. Rather, the allegation is merely that, through the **Exhibit C** emails, X approved component lists based on its *non-binding* forecasts. FAC ¶ 18.  This allegation is insufficient.

*First*, X's alleged "approval" of component lists is not a promise of payment. *See Fast Access Specialty Therapeutics, LLC v. UnitedHealth Grp., Inc.*, 532 F. Supp. 3d 956, 969 (S.D. Cal. 2021). In *Fast Access*, a pharmacy brought a promissory estoppel claim against an insurer for failure to pay for medications. The pharmacy alleged that it dispensed medications based on "preapprovals" from the insurer, and claimed that the preapprovals were a clear and unambiguous promise to pay for the dispensed drugs. *See id.* The court disagreed, finding that the pharmacy failed to identify "anything in the preapprovals, or anything about the 'issuance' of the preapprovals, that constitutes a clear and unambiguous promise to pay." *Id.*

The same is true here: Wiwynn has not alleged a clear and unambiguous promise to pay for excess components. At most, Wiwynn's complaint merely alleges that X regularly ensured that Wiwynn's contractually mandated component lists were indeed *accurate* lists.  That is not a promise to pay; it is a mere confirmation by X that Wiwynn would have the correct inventory on hand if X ultimately decided to issue Purchase Orders for servers.

*Second*, the Product Exhibits *required* Wiwynn to share with X a list of components necessary to meet X's non-binding forecasts before placing orders for those components with vendors. *E.g.*, Product Exhibits at 62–63; 107; 170.[18] The email exchanges included in **Exhibit C**

---

[18] "Prior to placing orders with the vendors to meet [X's] forecast, Supplier shall provide [X] with LLK (Long Leadtime Kit) for the long lead time components. Supplier will similarly provide [X] with SLK (Short Leadtime Kit) for short lead time components prior to placing purchase orders with

1  reflect this process, which was for the benefit of X, not Wiwynn. Among the benefits to X was the

2  assurance that Wiwynn would have the necessary components on hand to meet X's Purchase Orders,

3  if and when they were issued.  The **Exhibit C** emails did not, and could not, convert X's non-binding

4  forecasts into binding ones.

5        **3.**      **The one-off Exhibit D emails likewise cannot trump the MPA.**

6        Separate from its core theory that X's non-binding forecasts and alleged "approvals" of

7  Wiwynn's component lists were in fact binding promises to pay, Wiwynn separately alleges that X

8  made "express promises to bear the risk of loss" for certain "non-custom components." FAC ¶ 46.

9  To be clear, this standalone allegation (which did not appear in Wiwynn's original complaint)

10  involves a single email exchange in **Exhibit D** to the FAC that is completely unrelated to X's

11  forecasts or Wiwynn's component lists.

12        In those early 2022 emails, X's Christopher Kan asks Wiwynn to identify the "gating items

13  preventing you from building more racks." FAC Ex. D at 6. According to Wiwynn, the holdup was

14  delays by one sub-supplier of a component (NIC cards), so Mr. Kan asks Wiwynn to buy NIC cards

15  from a different supplier "to get around the [] delays and to build more racks." *Id.* at 4. In this one-

16  off circumstance, Mr. Kan tells Wiwynn that X "will pay for the excess NIC cards." *Id.* at 2.

17        Importantly, the email exchange in **Exhibit D** stands alone: It involves non-custom, non-

18  forecasted components ordered to circumvent a supply crunch, and has no bearing on the component

19  lists discussed in the rest of Wiwynn's complaint. Wiwynn doesn't (and can't) allege that similar

20  promises covered a single component beyond those mentioned in the **Exhibit D** emails.  At most,

21  then, Wiwynn has alleged a single, isolated promise of payment for a minor, standard component.

22  *See* FAC ¶ 46; Ex. D.  But Wiwynn has not stated a viable promissory estoppel claim for that minor

23  component: The alleged promise also arose in the context of the fully integrated MPA, which

24  Wiwynn admits did not require X to pay for the NIC cards. *See* FAC ¶¶ 21–22. The MPA cannot be

25  overridden by the informal **Exhibit D** email, and Wiwynn does not allege otherwise.

26

27

28  _____

vendors." *Id.* at 107.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

C.    **Breach of the Covenant of Good Faith and Fair Dealing**

Wiwynn's claim for breach of the implied covenant of good faith and fair dealing, FAC ¶¶ 48–52, fails for two reasons. First, a plaintiff alleging breach of the implied covenant must plead the specific contractual provisions that the defendant allegedly frustrated, which Wiwynn has failed to do. Second, the implied covenant may not create new duties, as Wiwynn's claim requires.

1.    **Wiwynn's failure to ground its claim in a specific provision is fatal.**

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Day v. GEICO Cas. Co*., No. 21-CV-02103-BLF, 2022 WL 2135746, at *2 (N.D. Cal. June 14, 2022) (citing *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000)) (emphasis original). "But the implied covenant can neither substantively *alter* the terms of the contract nor impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* (cleaned up). Since the covenant "functions as a *supplement* to the express contractual covenants," the "precise nature and extent of the duty imposed by the implied covenant depends upon the contours of the underlying contract." *W. Am. Ins. v. Shaghal Ltd*., No. CV2107751CJCJPRX, 2022 WL 17370532, at *3 (C.D. Cal. June 23, 2022) (quoting *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (emphasis original) (cleaned up)).

Adhering to these principles, courts routinely dismiss claims for breach of the covenant of good faith and fair dealing that do not allege the "specific contractual provision" that was frustrated.[19] This gatekeeping is necessary: "To allow a party to plead a breach of contract claim based on a violation of the covenant of good faith and fair dealing untethered from a specific contractual provision would undermine the certainty a contract provides, especially in light of later changed circumstances favorable to one party over the other." *Day*, 2022 WL 2135746, at *2.

---

[19] *See, e.g.*, *Day*, 2022 WL 2135746, at *2; *W. Am. Ins.,* 2022 WL 17370532, at *3; *Kroetch v. BAC Home Loan Services*, No. C 11-2860 MEJ, 2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011); *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. C-07-04178 JCS, 2008 WL 552482, at *7 (N.D. Cal. Feb. 27, 2008); *Love v. The Mail on Sunday*, No. CV057798ABCPJWX, 2006 WL 4046180, at *7 (C.D. Cal. Aug. 15, 2006).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Wiwynn's claim for breach of the covenant of good faith and fair dealing does not refer to any specific contractual provision and fails for this reason alone. *See* FAC ¶¶ 48–52.

### 2.    The implied covenant may not create new contract duties.

Rather than identifying any frustrated provision of the parties' contract, Wiwynn alleges that the MPA implied a covenant that X "would act in good faith and deal fairly," "do nothing to interfere with Wiwynn's interests and commitments," and "give at least the same level of consideration to the interests of Wiwynn" as its own. FAC ¶ 49. The MPA, obviously, says nothing of the sort. The implied covenant "***does not create a separate duty*** of fairness and reasonableness which can be independently breached." *See* Cal. Com. Code § 1304, cmt. 1. It only means that "a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract." *Id.*

The Ninth Circuit rejected an argument like Wiwynn's in *Openshaw v. FedEx Ground Package Sys., Inc.*, 576 F. App'x 685 (9th Cir. 2014). There, Openshaw claimed FedEx breached the implied covenant by, for example, "not telling Openshaw in advance how many packages he would have to deliver." *Id.* at 688. However, their contract "explicitly obligated Openshaw to provide trucks and drivers and to operate at a national standard." *Id.* The Ninth Circuit thus ruled for FedEx, as the implied covenant of good faith and fair dealing could not be used "to impose a substantive duty on FedEx to *help* Openshaw provide trucks and drivers or to meet delivery standards." *Id.* (emphasis original).

Wiwynn wants to shoehorn a brand-new contractual obligation on X to *help Wiwynn fulfill its own existing duty* under the MPA to stock necessary components so that it can timely fill X's orders if and when they are made. Both Wiwynn and Openshaw would convert their counterparties' *rights* to have their needs met (X's demand for servers and FedEx's for drivers) into a *duty* to make it easier to meet them. That is beyond the implied covenant's reach. *Cf. Microsoft Corp. v. Hon Hai Precision Indus. Co.*, No. 19-CV-01279-LHK, 2020 WL 836712, at *7–8 (N.D. Cal. Feb. 20, 2020) (dismissing implied covenant claim that "would effectively write in a requirement that Microsoft help Hon Hai perform its contract obligations").

Wiwynn's implied covenant claim is untethered from the law and thus warrants dismissal.

Sawyer & Labar llp
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

### D.    Intentional and Negligent Misrepresentation

The FAC's new claims for intentional and negligent misrepresentation, FAC ¶¶ 53–64, are foreclosed by the integrated MPA and the economic loss rule. They also give X no way to know which statements comprise the alleged fraud, falling well short of the heightened pleading standard.

#### 1.    The integrated MPA defeats Wiwynn's fraud claims.

As shown above, the MPA is incompatible with the notion that X's non-binding forecasts somehow became binding when X simply "approved" Wiwynn's corresponding component lists.

The MPA and Product Exhibits presume that Wiwynn alone bears costs incurred meeting its own obligations, MPA § 2.4; provide that forecasts are non-binding, *id.* § 4.3.3 and Product Exhibits at 10; obligate Wiwynn to acquire sufficient inventory to meet forecasted orders, MPA § 6.2 and Product Exhibits at 10; and place the pre-delivery risk of loss on Wiwynn subject to a single (inapplicable) exception, MPA § 4.3.4. And the MPA is the parties' fully integrated, "complete and exclusive" contract, which cannot be changed without another signed agreement. MPA § 14.13.

The contradiction between Wiwynn's fraud allegations and the MPA's text ends the inquiry. "California holds parties responsible for signing integrated contracts," and thus "parol evidence cannot be introduced to show fraud or misrepresentation if the parol evidence contradicts the language of an integrated contract[.]" *Brinderson–Newberg*, 971 F.2d at 281. This is so where, as here, "the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof." *Id.* (citing *Price v. Wells Fargo Bank,* 213 Cal. App. 3d 465 (1989)).[20]

#### 2.    The economic loss rule bars Wiwynn's fraud claims.

Wiwynn's misrepresentation claims also run afoul of the economic loss rule. The "fundamental rule in California is that no tort cause of action will lie where the breach of duty is

---

[20] *See also, e.g., Nikoonahad v. Rudolph Techs., Inc*., No. C 08-2290 JF (PVT), 2009 WL 1330811, at *5–6 (N.D. Cal. May 13, 2009) (granting motion to dismiss where parol evidence— purportedly showing the defendant "had no intention of performing," as Wiwynn has similarly alleged here—contradicted the contract language and so was "barred by the integration clause"); *World Health & Educ. Found. v. Carolina Cas. Ins. Co*., 612 F. Supp. 2d 1089, 1097 (N.D. Cal. 2009) (same; misrepresentations related to the contract would contradict its terms); *Baymiller v. Guarantee Mut. Life Co*., No. SA CV 99-1566 DOC AN, 2000 WL 1026565, at *4 (C.D. Cal. May 3, 2000) (same).

nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Oracle USA, Inc. v. XL Glob. Services, Inc.*, No. C 09-00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009). Contract actions "enforce the intentions of the parties to the agreement"; tort claims "vindicate social policy." *Id.* (citing *Foley v. Interactive Data Corp.*, 47 Cal.3d 654 (1988)).[21]

Thus, the "threshold question" is whether Wiwynn "states a claim that arises from something other than contract—i.e., for a breach of some duty that has been placed on [X] to vindicate social policy, rather than to protect [Wiwynn's] bargained-for expectations." *Id.* It does not. "There is no conduct at issue which is independent from the various promises made by the parties in the course of their contractual relationship." *Id.*

In an analogous case, the plaintiff's purported acts of reliance "constitute[d] nothing more than [its] usual performance under the Agreement." *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012). Here too, Wiwynn allegedly relied on the misstatements by "procur[ing] components on X Corp.'s behalf to provide services for X Corp." FAC ¶¶ 56, 62. Wiwynn was already obligated to take those acts in performing the MPA. Plus, X's alleged misrepresentations also form the basis of Wiwynn's claim for breach of contract. These tort claims, like those in *JMP*, make for a "direct application" of the economic loss rule, as Wiwynn "has taken the allegations underpinning a straightforward claim for breach of a commercial contract and recast them as torts." *JMP*, 880 F. Supp. 2d at 1043 (dismissing claims with prejudice because the economic loss rule applies "[h]owever they are framed").

### 3.    Rule 9(b) requires more than Wiwynn's bare allegations.

In any case, Wiwynn has inadequately pleaded its misrepresentation claims. "The elements of fraud are misrepresentation, scienter, intent to induce reliance, justifiable reliance and resulting

---

[21] The law simply "does not distinguish between good and bad motives for breaching a contract." *Id.* (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503 (1994)). "Virtually any time a contract has been breached, the party bringing suit can allege that the breaching party never intended to meet its obligations. To allow fraud claims in actions such as this one would collapse the carefully-guarded distinction between contract and tort law." *Foster Poultry Farms v. Alkar–Rapidpak–MP Equip., Inc.*, 868 F. Supp. 2d 983, 993–94 (E.D. Cal. 2012).

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1  damage." *Oracle*, 2009 WL 2084154, at *3. "In all averments of fraud or mistake, the circumstances
2  constituting fraud or mistake shall be stated with particularity." FED. R. CIV. PROC. 9(b). Rule 9(b)'s
3  heightened pleading standard applies to both of Wiwynn's misrepresentation claims. *See Hon Hai*,
4  2020 WL 836712, at *9 (collecting cases). This standard "demands that the circumstances
5  constituting the alleged fraud be specific enough to give defendants notice of the particular
6  misconduct so that they can defend against the charge and not just deny that they have done anything
7  wrong." *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir. 2009) (cleaned up).

8      Thus, Wiwynn's allegations must specifically state the "time, place, and specific content of
9  the false representations as well as the identities of the parties to the misrepresentations." *Swartz v.*
10 *KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Wiwynn must plead "what is false
11 and misleading about a statement, and why it is false." *Newbeck v. Washington Mut. Bank*, No. C
12 09-1599 CW, 2010 WL 3222174, at *4 (N.D. Cal. Aug. 13, 2010) (quoting *In re GlenFed, Inc., Secs.*
13 *Litig.,* 42 F.3d 1541, 1548 (9th Cir. 1994)).

14     Yet Wiwynn offers only this: "X Corp.—by and through its agents including but not limited
15 to Christopher Kan—represented to Wiwynn that X Corp. would assume liability of the approved
16 components." FAC ¶¶ 54 (intentional misrepresentation); 60 (negligent). Wiwynn does not identify
17 "the who, what, when, where, and how" of X's alleged fraud. *See Newbeck*, 2010 WL 3222174, at
18 *4 (quoting *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003)). "None of the
19 complaint's allegations of fraud state the time, place and manner of the alleged misrepresentations"
20 and "only a few of the alleged misrepresentations identify the person who made the statement."
21 *Silicon Knights, Inc. v. Crystal Dynamics, Inc*., 983 F. Supp. 1303, 1315 (N.D. Cal. 1997) (granting
22 motion to dismiss).

23     The misrepresentation claims do not reference the emails attached to the FAC, and requiring
24 X to guess at how and why those informal communications could conceivably amount to fraud
25 would defeat the purpose of Rule 9(b). If those emails make up the alleged fraud, however, they
26 cannot support a claim for intentional or negligent misrepresentation. Wiwynn could not have
27 reasonably misunderstood X's statements as a promise of payment, as the terms under which X
28 promised to make payments were set forth in the unambiguous contract under which the parties had

1   operated for years. *See* Section III, *supra*. Nor could Wiwynn have reasonably relied on any alleged

2   misrepresentation in procuring components because, as discussed above, Wiwynn had a preexisting

3   duty to maintain a sufficient supply of components to meet X's needs. *E.g.*, MPA § 6.2; Product

4   Exhibits at 10. Even assuming the purported misrepresentations contradicted the MPA, the

5   circumstances—the integration clause as well as the no-oral-modification provision, negotiated by

6   "sophisticated corporate entities represented by counsel"—foreclose any allegation of justifiable

7   reliance on any extra-contractual statements. *See Hon Hai,* 2020 WL 836712, at *11.

8        Wiwynn has not adequately pleaded reliance, either. Wiwynn alleges that it "procure[d]

9   components on X Corp.'s behalf to provide services for X Corp," FAC ¶¶ 56–57; 62–63, but as

10  discussed above, Wiwynn was already required to acquire these components. *See supra* § V(B)(1).

11       Finally, while scienter "may be averred generally, simply by saying that it existed,"

12  *Newbeck*, 2010 WL 3222174, at *4, Wiwynn does not even do that. Instead, Wiwynn pleads that X

13  knowingly or negligently made false statements *only if* "X Corp. contends that it had no intention

14  of fully compensating Wiwynn." FAC ¶¶ 55; 61. This kind of conditional language is no substitute

15  for particularly stated allegations. Nor do any of the brief email conversations attached to the FAC

16  support an inference that X acted with the requisite mental state and intended to induce reliance on

17  a misrepresentation.

18  **VI.   CONCLUSION**

19       X respectfully requests that Wiwynn's First Amended Complaint be dismissed with prejudice.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

X CORP.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

DATED: November 22, 2024        Respectfully submitted,

**SAWYER & LABAR LLP**

By: */s/ Adrian Sawyer*
 Adrian Sawyer

Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820
sawyer@sawyerlabar.com

**GIBBS & BRUNS LLP**
David Sheeren *(pro hac vice)*
dsheeren@gibbsbruns.com
Caitlin Halpern *(pro hac vice)*
chalpern@gibbsbruns.com
Mark Doré *(pro hac vice)*
mdore@gibbsbruns.com
Nick Beachy *(pro hac vice)*
nbeachy@gibbsbruns.com
1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

X CORP.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT